(Slip Opinion) OCTOBER TERM, 2013 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* APEL

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 12–1038. Argued December 4, 2013—Decided February 26, 2014

Vandenberg Air Force Base has been designated a "closed base," meaning that civilians may not enter without express permission. The Air Force has granted an easement over two areas of the Base, with the result that two public highways traverse the Base. Adjacent to one of those highways is an area that the Government has designated for peaceful protests. The Base commander has enacted several restrictions to control the protest area and has issued an advisory stating that anyone who fails to adhere to the protest area policies may be barred from entering the Base.

Petitioner Apel was barred from the Base for trespassing and vandalism, but continued to enter the protest area. A Magistrate Judge convicted him of violating 18 U. S. C. §1382, which makes it a crime to reenter a "military. . . installation" after having been ordered not to do so "by any officer or person in command." On appeal, the Federal District Court rejected Apel's defense that §1382 does not apply to the designated protest area. The Ninth Circuit reversed. It held that because the easement through Vandenberg deprived the Government of exclusive possession, §1382 did not cover the portion of the Base where Apel's protest occurred.

*Held*: A "military. . . installation" for purposes of §1382 encompasses the commanding officer's area of responsibility, and it includes Vandenberg's highways and protest area. Pp. 6–14.

 (a) Contrary to Apel's argument, §1382 does not require exclusive possession and control. The statute is written broadly to apply to many different kinds of military places, and nothing in its text defines those places in terms of the access granted to the public or the nature of the Government's possessory interest. See *United States* v. *Albertini*, 472 U. S. 675, 682. Nor have military places been defined

historically as land withdrawn from public use. The common feature of the places described in §1382 is that they have defined boundaries and are subject to the command authority of a military officer. This conclusion is confirmed by *United States* v. *Phisterer*, 94 U. S. 219, 222, which defined the term "military station" as a place "where military duty is performed or military protection afforded." And while some Executive Branch documents have said that §1382 requires exclusive possession, those opinions are nonbinding, and this Court has never held that the Government's reading of a criminal statute is entitled to any deference. Pp. 7–10.

   (b) Section 1382 applies to any place with a defined boundary that is under the command of a military officer. Apel contends that the highways and protest area are outside the Base because they lie outside fenced areas on the Base, but this argument assumes the conclusion. The United States has placed the entire Vandenberg property under the administration of the Air Force. The Air Force's choice to secure a portion of the Base more closely does not alter its boundaries or diminish its commander's jurisdiction. Apel's further contention that the highways and protest area are uncontrolled spaces where military operations are not performed is contrary to the record: The Base commander has enacted rules to restrict the manner of protests in the designated area and has publicly stated that persons barred from Vandenberg may not enter the Base to protest; the District Court found that the Government exercises substantial control over the protest area; the easement itself reserves to the Base commander the authority to restrict access to the entire Base when necessary and reserves to the United States rights of way for all purposes; and the Base commander has occasionally closed the highways to the public for security purposes or when conducting a military launch. In any event, §1382 does not require base commanders to make continuous, uninterrupted use of a place within their jurisdiction, lest they lose authority to exclude certain individuals. Such a use-it-or-lose-it rule would frustrate the administration of military facilities, raise difficult questions for judges, and discourage commanders from opening portions of their bases for public convenience. Pp. 10–13.

   (c) Apel's argument that the statute was unconstitutional as applied was not reached by the Ninth Circuit and, thus, is not addressed here. P. 13.

676 F. 3d 1202, vacated and remanded.

   ROBERTS, C. J., delivered the opinion for a unanimous Court. GINSBURG, J., filed a concurring opinion, in which SOTOMAYOR, J., joined. ALITO, J., filed a concurring opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–1038

UNITED STATES, PETITIONER *v.* JOHN DENNIS APEL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[February 26, 2014]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Federal law makes it a crime to reenter a "military . . . installation" after having been ordered not to do so "by any officer or person in command." 18 U. S. C. §1382. The question presented is whether a portion of an Air Force base that contains a designated protest area and an easement for a public road qualifies as part of a "military installation."

I

A

Vandenberg Air Force Base is located in central California, near the coast, approximately 170 miles northwest of Los Angeles. The Base sits on land owned by the United States and administered by the Department of the Air Force. It is the site of sensitive missile and space launch facilities. The commander of Vandenberg has designated it a "closed base," meaning that civilians may not enter without express permission. Memorandum for the General Public Re: Closed Base, from David J. Buck, Commander (Oct. 23, 2008), App. 51; see also 32 CFR

§809a.2(b) (2013) ("Each [Air Force] commander is authorized to grant or deny access to their installations, and to exclude or remove persons whose presence is unauthorized").

Although the Base is closed, the Air Force has granted to the County of Santa Barbara "an easement for a right-of-way for a road or street" over two areas within Vandenberg. Department of the Air Force, Easement for Road or Street No. DA–04–353–ENG–8284 (Aug. 20, 1962), App. 35. Pursuant to that easement, two state roads traverse the Base. Highway 1 (the Pacific Coast Highway) runs through the eastern part of the Base and provides a route between the towns of Santa Maria and Lompoc. Highway 246 runs through the southern part of the Base and allows access to a beach and a train station on Vandenberg's western edge. The State of California maintains and polices these highways as it does other state roads, except that its jurisdiction is merely "concurrent" with that of the Federal Government. Letter from Governor Edmund G. Brown, Jr., to Joseph C. Zengerle, Assistant Secretary of the Air Force (July 21, 1981), App. 40. The easement instrument states that use of the roads "shall be subject to such rules and regulations as [the Base commander] may prescribe from time to time in order to properly protect the interests of the United States." Easement, App. 36. The United States also "reserves to itself rights-of-way for all purposes" that would not create "unnecessary interference with . . . highway purposes." *Id.,* at 37.

As relevant to this case, Highway 1 runs northwest several miles inside Vandenberg until it turns northeast at a 90 degree angle. There Highway 1 intersects with Lompoc Casmalia Road, which continues running northwest, and with California Boulevard, which runs southwest. In the east corner of this intersection there is a middle school. In the west corner there is a visitors' center and a public bus stop. A short way down California

Boulevard is the main entrance to the operational areas of the Base where military personnel live and work. Those areas are surrounded by a fence and entered by a security checkpoint. See Appendix, *infra* (maps from record).

In the south corner of the intersection is an area that has been designated by the Federal Government for peaceful protests. A painted green line on the pavement, a temporary fence, Highway 1, and Lompoc Casmalia Road mark the boundaries of the protest area. Memorandum for the General Public Re: Limited Permission for Peaceful Protest Activity Policy, from David J. Buck, Commander (Oct. 23, 2008), App. 57–58. The Base commander has enacted several restrictions to control the protest area, including reserving the authority "for any reason" to withdraw permission to protest and "retain[ing] authority and control over who may access the installation, including access to roadway easements for purposes other than traversing by vehicle through the installation." *Ibid.* A public advisory explains other rules for the protest area: demonstrations "must be coordinated and scheduled with [B]ase Public Affairs and [Base] Security Forces at least two (2) weeks in advance"; "[a]nyone failing to vacate installation property upon advisement from Security Forces will be cited for trespass pursuant to [18 U. S. C. §1382]"; and "[a]ctivities other than peaceful protests in this area are not permitted and are specifically prohibited." U. S. Air Force Fact Sheet, Protest Advisory, App. 52–53.

The advisory states, consistent with federal regulations, that anyone who fails to adhere to these policies may "receive an official letter barring you from entering Vandenberg." *Id.,* at 55; see also 32 CFR §809a.5 ("Under the authority of 50 U. S. C. [§]797, installation commanders may deny access to the installation through the use of a barment order"). And for any person who is "currently barred from Vandenberg AFB, there is no exception to the

barment permitting you to attend peaceful protest activity on Vandenberg AFB property. If you are barred and attend a protest or are otherwise found on base, you will be cited and detained for a trespass violation due to the non-adherence of the barment order." Protest Advisory, App. 54.

B

John Dennis Apel is an antiwar activist who demonstrates at Vandenberg. In March 2003, Apel trespassed beyond the designated protest area and threw blood on a sign for the Base. He was convicted for these actions, was sentenced to two months' imprisonment, and was barred from the Base for three years. In May 2007, Apel returned to Vandenberg to protest. When he trespassed again and was convicted, he received another order barring him from Vandenberg, this time permanently, unless he followed specified procedures "to modify or revoke" the order. Memorandum for John D. Apel Re: Barment Order (Oct. 22, 2007), App. 63–65. The only exception to the barment was limited permission from the Base commander for Apel to "'traverse', meaning to travel . . . on [Highway] 1 and . . . on [Highway] 246 . . . . You are not authorized to deviate from these paved roadways onto [Vandenberg] property." *Id.,* at 64. The order informed Apel that if he reentered Vandenberg in violation of the order, he would "be subject to detention by Security Forces personnel and prosecution by civilian authorities for a violation of [18 U. S. C. §1382]." *Ibid.*

Apel ignored the commander's order and reentered Vandenberg several times during 2008 and 2009. That led the Base commander to serve Apel with an updated order, which informed him:

"You continue to refuse to adhere to the rules and guidelines that have been put in place by me to protect and preserve order and to safeguard the persons

and property under my jurisdiction by failing to re-
main in the area approved by me for peaceful demon-
strations pursuant to [50] U. S. C. §797 and 32
C. F. R. §809a.0–[809]a.11. You cannot be expected
or trusted to abide by the protest guidance rules based
upon this behavior. I consider your presence on this
installation to be a risk and detrimental to my re-
sponsibility to protect and preserve order and to safe-
guard the persons and property under my jurisdiction.
You are again ordered not to enter onto [Vandenberg]
property, as provided in the October 22, 2007 order.
The content and basis of that order is hereby incorpo-
rated by reference herein, EXCEPT that your barment
will be for a period of three (3) years from the date
of this supplemental letter." Memorandum for John D.
Apel Re: Barment Order Dated Oct. 22, 2007 (served
Jan. 31, 2010), App. 59–62.

Apel ignored this barment order too, and on three occa-
sions in 2010 he reentered Vandenberg to protest in the
designated area. Each time Vandenberg security person-
nel reminded him of the barment order and instructed him
to leave. Each time Apel refused. He was cited for violat-
ing §1382 and escorted off Base property.

A Magistrate Judge convicted Apel and ordered him to
pay a total of $355 in fines and fees. Apel appealed to the
Federal District Court for the Central District of Califor-
nia. The District Court rejected Apel's defense that §1382
does not apply to the designated protest area, holding that
the military "has a sufficient possessory interest and
exercises sufficient control over" the area. App. to Pet. for
Cert. 14a. The court also concluded that Apel's conviction
would not violate the First Amendment. *Id.,* at 13a.

The United States Court of Appeals for the Ninth Cir-
cuit reversed, holding that the statute does not apply.
Based on Circuit precedent, the Ninth Circuit interpreted

§1382 to require the Government to prove that it has "the exclusive right of possession of the area on which the trespass allegedly occurred." 676 F. 3d 1202, 1203 (2012) (citing *United States* v. *Parker*, 651 F. 3d 1180 (CA9 2011)). The court found that the easement through Vandenberg deprived the Government of exclusive possession of the roadway, so it concluded that §1382 does not cover the portion of the Base where Apel's protest occurred.

We granted certiorari, 569 U. S. ___ (2013), and now vacate the judgment.

## II

Section 1382 provides in full:

> "Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or
>
> "Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—
>
> "Shall be fined under this title or imprisoned not more than six months, or both."

Apel does not dispute that he was "found within" the lawful boundaries of Vandenberg, "within the jurisdiction of the United States," after having been "ordered not to reenter" by the Base commander. §1382. And certainly Vandenberg would naturally be described as a "military installation": it is an Air Force base, which a military commander has closed to the public (with limited exceptions), located on land owned by the United States and under the jurisdiction of the Air Force, where military personnel conduct sensitive missile operations.

Against this straightforward interpretation, Apel insists that §1382 applies only where the military exercises *exclusive* possession and control, which, he contends, does not include land subject to a roadway easement. Apel further argues that the fence enclosing Vandenberg's operational facilities marks the *real* boundary of the Base and that Vandenberg's commander lacks authority to control the rest, or at least the designated protest area. We take his arguments in turn.

A

Apel asserts that the Ninth Circuit's exclusive possession and control requirement "derives directly from the text of §1382." Brief for Respondent 23. It does not. Section 1382 is written broadly to apply to many different kinds of military places: a "reservation, post, fort, arsenal, yard, station, or installation." Nothing in the text defines those places in terms of the access granted to the public or the nature of the Government's possessory interest. See *United States* v. *Albertini*, 472 U. S. 675, 682 (1985) ("The language of the statute does not limit §1382 to military bases where access is restricted").

Apel contends that the listed military places have historically been defined as land withdrawn from public use. Not so. Historical sources are replete with references to military "forts" and "posts" that provided services to civilians, and were open for access by them. See, *e.g.,* R. Wooster, Soldiers, Sutlers, and Settlers 64 (1987) ("The frontier forts of Texas were not simply army bases occupied solely by military personnel. They were often bustling communities that attracted merchants, laborers, settlers, and dependents"); Davis, The Sutler at Fort Bridger, 2 Western Hist. Q. 37, 37, 40–41 (Jan. 1971) (describing a 19th-century post in southwestern present Wyoming which included a "sutler," a civilian merchant who set up shop inside the fort and sold wares both to

soldiers and to civilians from outside the base).

The common feature of the places described in §1382 is not that they are used exclusively by the military, but that they have defined boundaries and are subject to the command authority of a military officer. That makes sense, because the Solicitor General has informed us that a military commander's authority is frequently defined by the boundaries of a particular place: When the Department of Defense establishes a base, military commanders assign a military unit to the base, and the commanding officer of the unit becomes the commander of the base. Tr. of Oral Arg. 6–7.

Apel responds by invoking our decision in *United States* v. *Phisterer*, 94 U. S. 219 (1877), which held that the term "military station" (in a different statute) did not include a soldier's off-base home. But *Phisterer* only confirms our conclusion that §1382 does not require exclusive use, possession, or control. For there we interpreted "military station" to mean "a place where troops are assembled, where military stores, animate or inanimate, are kept or distributed, where military duty is performed or military protection afforded,—where something, in short, more or less closely connected with arms or war is kept or is to be done." *Id.,* at 222. To describe a place as "more or less closely connected" with military activities hardly requires that the military hold an exclusive right to the property. Rather, "military duty" and "military protection" are synonymous with the exercise of *military jurisdiction*. And that, not coincidentally, is precisely how the term "military installation" is used elsewhere in federal law. See, *e.g.,* 10 U. S. C. §2687(g)(1) (defining "military installation" as a "base . . . or other activity under the jurisdiction of the Department of Defense"); §2801(c)(4) (defining "military installation" as a "base . . . or other activity under the jurisdiction of the Secretary of a military department"); 32 CFR §809a.0 ("This part prescribes the

commanders' authority for enforcing order within or near Air Force installations under their jurisdiction and controlling entry to those installations").

Apel also relies on the fact that some Executive Branch documents, including the United States Attorneys' Manual and opinions of the Air Force Judge Advocate General, have said that §1382 requires exclusive possession. Brief for Respondent 44–47. So they have, and that is a point in his favor. But those opinions are not intended to be binding. See Dept. of Justice, United States Attorneys' Manual §1–1.100 (2009) ("The Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal"); 2 Civil Law Opinions of The Judge Advocate General, United States Air Force 1978–1983 (Preface) (opinions of the Judge Advocate General "are good starting points but should not be cited as precedence [sic] without first verifying the validity of the conclusions by independent research"). Their views may reflect overly cautious legal advice based on division in the lower courts. Or they may reflect legal error. Either way, we have never held that the Government's reading of a criminal statute is entitled to any deference. See *Crandon* v. *United States*, 494 U. S. 152, 177 (1990) (SCALIA, J., concurring in judgment).

Today, as throughout our Nation's history, there is significant variation in the ownership status of U. S. military sites around the world. Some are owned in fee, others are leased. Some are routinely open to the public, others are open for specific occasions or purposes, and no public access whatsoever is permitted on others. Many, including such well-known places as the Washington Navy Yard and the United States Air Force Academy, have roads running through them that are used freely by the public. Nothing in §1382 or our history suggests that the

statute does not apply to a military base under the command of the Air Force, merely because the Government has conveyed a limited right to travel through a portion of the base or to assemble in a particular area.

## B

Section 1382 is most naturally read to apply to places with a defined boundary under the command of a military officer. Apel argues, however, that Vandenberg's commander has no authority on the highways running through the Base or, apparently, in the designated protest area. His arguments more or less reduce to two contentions: that the highways and protest area lie "outside the entrance to [a] closed military installation[]," Brief for Respondent 22, and that they are "uncontrolled" spaces where "no military operations are performed," *id.,* at 23. Neither contention is sound.

First, to say that the highway and protest area are "outside" the Vandenberg installation is not a legal argument; it simply assumes the conclusion. Perhaps recognizing as much, Apel tacks: He suggests that because Vandenberg's operational facilities are surrounded by a fence and guarded by a security checkpoint, the Government has determined that it does not control the rest of the Base. The problem with this argument is that the United States has placed the *entire* Vandenberg property under the administration of the Air Force, which has defined that property as an Air Force base and designated the Base commander to exercise jurisdiction. Federal law makes the commander responsible "for the protection or security of" "property subject to the jurisdiction, administration, or in the custody of the Department of Defense." 50 U. S. C. §§797(a)(2), (4); see also 32 CFR §809a.2(a) ("Air Force installation commanders are responsible for protecting personnel and property under their jurisdiction"). And pursuant to that authority, the Base com-

mander has issued an order closing the entire base to the public. Buck Memorandum Re: Closed Base, App. 51; see also 32 CFR §809a.3 ("any directive issued by the commander of a military installation or facility, which includes the parameters for authorized entry to or exit from a military installation, is legally enforceable against all persons"). The fact that the Air Force chooses to secure a portion of the Base more closely—be it with a fence, a checkpoint, or a painted green line—does not alter the boundaries of the Base or diminish the jurisdiction of the military commander.

As for Apel's claim that the protest area specifically is uncontrolled, the record is conclusively to the contrary. The Base commander "at all times has retained authority and control over who may access the installation," including the protest area. Buck Memorandum Re: Protest Activity, App. 58. He has enacted rules to restrict the manner of protests in the designated area. Protest Advisory, App. 53. In particular, he requires two weeks' notice to schedule a protest and prohibits the distribution of pamphlets or leaflets. *Id.,* at 52–53. The Base commander has also publicly stated that persons who are barred from Vandenberg—for whatever reason—may not come onto the Base to protest. *Id.,* at 54. And the District Court found, after hearing testimony, that "the Government exercises substantial control over the designated protest area, including, for example, patrolling the area." App. to Pet. for Cert. 14a–15a. Apel has never disputed these facts.

Instead Apel tells us that, by granting an easement, the military has "relinquished its right to exclude civilians from Highway 1," Brief for Respondent 36, and that the easement does not "permit[]" use by the military, *id.,* at 43. But the easement itself specifically reserves to Vandenberg's commander the authority to restrict access to the entire Base, including Highway 1, when necessary "to

properly protect the interests of the United States," and likewise "reserves to [the United States] rights-of-way for all purposes." Easement, App. 36. We simply do not understand how Apel can claim that "[n]othing in the easement contemplates, or even permits, military use or occupation; it provides for exclusive civil use and occupation." Brief for Respondent 43. Moreover, the Base commander, in an exercise of his command authority, has notified the public that use of the roads is "limited to . . . vehicular travel activity through the base," which does not include Apel's protest activity. See Buck Memorandum Re: Closed Base, App. 51.

Apel likewise offers no support for his contention that military functions do not occur on the easement highways. The Government has referred us to instances when the commander of Vandenberg has closed the highways to the public for security purposes or when conducting a military launch. Reply Brief 12, and n. 5; Tr. of Oral Arg. 8–9. In any event, there is no indication that Congress intended §1382 to require base commanders to make continuous, uninterrupted use of a place within their jurisdiction, lest they lose authority to exclude individuals who have vandalized military property and been determined to pose a threat to the order and security of the base.

In sum, we decline Apel's invitation to require civilian judges to examine U. S. military sites around the world, parcel by parcel, to determine which have roads, which have fences, and which have a sufficiently important, persistent military purpose. The use-it-or-lose-it rule that Apel proposes would frustrate the administration of military facilities and raise difficult questions for judges, who are not expert in military operations. And it would discourage commanders from opening portions of their bases for the convenience of the public. We think a much better reading of §1382 is that it reaches all property within the defined boundaries of a military place that is under the

command of a military officer.

## III

Much of the rest of Apel's brief is devoted to arguing that §1382 would be unconstitutional as applied to him on this Base. But the Court of Appeals never reached Apel's constitutional arguments, and we decline to do so in the first instance. Apel also attempts to repackage his First Amendment objections as a statutory interpretation argument based on constitutional avoidance. See Brief for Respondent 54 ("the statute should be interpreted . . . not to apply to peaceful protests on a public road outside of a closed military base over which an easement has been granted and that has been declared a protest zone"). But we do not "interpret" statutes by gerrymandering them with a list of exceptions that happen to describe a party's case. "The canon [of constitutional avoidance] is not a method of adjudicating constitutional questions by other means." *Clark* v. *Martinez*, 543 U. S. 371, 381 (2005). Whether §1382 is unconstitutional as applied is a question we need not address.

\* \* \*

Where a place with a defined boundary is under the administration of a military department, the limits of the "military installation" for purposes of §1382 are coterminous with the commanding officer's area of responsibility. Those limits do not change when the commander invites the public to use a portion of the base for a road, a school, a bus stop, or a protest area, especially when the commander reserves authority to protect military property by, among other things, excluding vandals and trespassers.

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

APPENDIX

Santa Maria-Highway 1 Gate to Vandenberg Air Force Base



Gate Entrance and Green Line

Vandenberg Middle School

Visitor Control Center

Protest Site

Inner Gate Barrier with Guard Shack



# SUPREME COURT OF THE UNITED STATES

_____

No. 12–1038

_____

## UNITED STATES, PETITIONER *v.* JOHN DENNIS APEL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[February 26, 2014]

JUSTICE GINSBURG, with whom JUSTICE SOTOMAYOR joins, concurring.

I agree with the Court's reading of 18 U. S. C. §1382: The military's choice "to secure a portion of the Base more closely—be it with a fence, a checkpoint, or a painted green line—does not alter the boundaries of the Base or diminish the jurisdiction of the military commander." *Ante,* at 11. But a key inquiry remains, for the fence, checkpoint, and painted line, while they do not alter the Base boundaries, may alter the First Amendment calculus.

When the Government permits the public onto part of its property, in either a traditional or designated public forum, its "ability to permissibly restrict expressive conduct is very limited." *United States* v. *Grace,* 461 U. S. 171, 177 (1983). In such venues, the Government may enforce "reasonable time, place, and manner regulations," but those regulations must be "content-neutral [and] narrowly tailored to serve a significant government interest." *Ibid.* (internal quotation marks omitted).

The stated interest of the Air Force in keeping Apel out of the area designated for peaceful protest lies in ensuring base security. Brief for United States 22–26. See also Reply Brief 21–22. That interest, however, must be assessed in light of the general public's (including Apel's)

permission to traverse, at any hour of the day or night, the highway located a few feet from the designated protest area. See Appendix to opinion of the Court, *ante* (displaying maps of the area). The Air Force also permits open access to the middle school, bus stop, and visitors' center, all situated in close proximity to the protest area. See *ante,* at 2.

As the Air Force has exhibited no "special interes[t] in who walks [or] talks" in these places, *Flower* v. *United States*, 407 U. S. 197, 198 (1972) (*per curiam*), it is questionable whether Apel's ouster from the protest area can withstand constitutional review. The Court has properly reserved that issue for consideration on remand. *Ante*, at 13. In accord with that reservation, I join the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–1038

_____

## UNITED STATES, PETITIONER *v.* JOHN DENNIS APEL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[February 26, 2014]

JUSTICE ALITO, concurring.

The Ninth Circuit did not rule on the constitutionality of 18 U. S. C. §1382, and I see no reason to express any view on that question at this time. See *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 529 (2009). "This Court . . . is one of final review, 'not of first view.'" *Ibid.* (quoting *Cutter* v. *Wilkinson*, 544 U. S. 709, 719, n. 7 (2005)). Our failure to address this question should not be interpreted to signify either agreement or disagreement with the arguments outlined in JUSTICE GINSBURG's concurrence.